Michael J. Frevola
Christopher R. Nolan
K. Blythe Daly
HOLLAND & KNIGHT LLP
31 West 52nd St.
New York, NY  10019
Telephone:  (212) 513-3200
Telefax:  (212) 385-9010
michael.frevola@hklaw.com
christopher.nolan@hklaw.com
blythe.daly@hklaw.com

ATTORNEYS FOR PLAINTIFF
MOTI SHIPPING LTD.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MOTI SHIPPING LTD.<br><br>　　　　　　　　Plaintiff,<br><br>　　- against -<br><br>DNV GL GROUP AS f/k/a DET NORSKE VERITAS AS, DNV GL AS, DET NORSKE VERITAS (USA) INC., JOHN DOE, INC. #1 through JOHN DOE, INC. #50, unknown companies in the DNV GL GROUP AS corporate family,<br><br>　　　　　　　　Defendants. | Civil Action No.<br><br>**COMPLAINT** |

Plaintiff, MOTI SHIPPING LTD. ("Moti" or "Owner"), by and through its attorneys, sues Defendants DNV GL GROUP AS f/k/a DET NORSKE VERITAS AS (the "Group"), DNV GL AS, DET NORSKE VERITAS (USA) INC. ("DNV USA"), JOHN DOE, INC. #1 through JOHN DOE, INC. #50, unknown companies in the DNV GL GROUP AS corporate family (the "Doe Defendants") (collectively, "Defendants"), and alleges as follows:

## PRELIMINARY STATEMENT

1.      This is a tort action involving the failure of the rudder horn and rudder stock of the bulk carrier *M/V DARYA MOTI* (the "Vessel").  On January 8, 2014, a loud noise was heard in the aft area of the Vessel, following which the Vessel lost all steering ability.   Subsequent investigation revealed that the Vessel had lost her rudder.  As a result of the rudder horn and rudder stock failures, the Vessel and her crew spent nine days in the middle of the Atlantic Ocean in mid-winter, subject to the perils of the sea, until a salvage tug could reach the stricken Vessel.[1]

2.      At the time of the incident, the Vessel was on a laden voyage from Pulau Laut, Indonesia to Bridgeport, Connecticut carrying Envirocoal in bulk.

3.      During the ensuing investigation mounted by various shipowner interests, significant design weaknesses in the Vessel's rudder system were discovered.  Some or all of the Defendants, as part of the Vessel's classification society, fully were involved in the building of Vessel.   They likewise conducted surveys after the Vessel was launched.   But in this case, Defendants also approved the design of the Vessel itself (including her rudder system) and approved the Vessel's construction during the build.

---

[1]   As can be imagined, the frequent outcome of the removing of the ability to steer from a vessel weighing tens of thousands of tons – with all of the momentum such mass implies – is a tragedy involving significant property damage, injuries to persons and even deaths.  Steering failures have caused several catastrophic maritime casualties over the course of the last few decades.  *See, e.g., China Union Lines, Ltd. v. A.O. Andersen & Co.*, 364 F.2d 769 (5th Cir. 1966) (*M/V UNION RELIANCE* and *M/V BEREAN*, steering gear failure, collision, fire, death of crew, cargo damage in Galveston Bay); *Frota Oceanic Brasileira, S.A. v. M/V ALICE ST. PHILIP*, 790 F.2d 412 (5th Cir. 1986) (*M/V ALICE ST. PHILIP* steering failure causing collision between 2 other vessels when attempting to avoid disabled vessel) (Mississippi River); *In re Oil Spill by the Amoco Cadiz Off the Coast of France on March 16, 1978*, 954 F.2d 1279 (7th Cir. 1992) (*M/V AMOCO CADIZ* steering gear failure, breaking apart, sinking, oil spill, off coast of France); *In re Flota Mercante Grancolombiana, S.A.*, 440 F. Supp. 704 (S.D.N.Y. 1977) (*M/V REPUBLICA DE COLOMBIA* and *S/S TRANSHAWAII*, steering failure, collision off Cape Hatteras); *Mississippi River Bridge Authority v. M/V POLA DE LENA*, 567 F. Supp. 311 (E.D. La. 1983) (*M/V POLA DE LENA* defective steering mechanism, allision with ferry landing and two ferry boats) (Mississippi River); *In re American Export Lines, Inc.*, 620 F. Supp. 490 (S.D.N.Y. 1985) (*M/V SEA WITCH* steering failure, allision, fire, death of crew members, cargo loss in New York Harbor).

4.      During this critical period, Defendants missed opportunities to warn Owners of the risk of rudder failure.  Defendants – as corporate entities involved in the design and construction of the Vessel and in surveying the product of their group both while it was being constructed and after it entered operations – uniquely were positioned to spot a design flaw and rectify that flaw before someone might be injured, or before a vessel sank with a significant loss of lives.  Yet, despite Defendants' involvement in the design and construction of the Vessel, and despite Defendants' knowledge that other sister vessels it in the same class had experienced similar rudder failures over the course of the preceding eight years (i.e., since 2006, well before the Vessel was fully built), Defendants did nothing to change their way of business, presumably because it was lucrative, because their design kept them their contract with the shipbuilder, and because recalls would have been costly.  Defendants' failures form the subject of this maritime tort claim.

## JURISDICTION AND VENUE

5.      The Court has jurisdiction of this action under 28 U.S.C. § 1332(a)(2) because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between a citizen of a state and a citizen or subject of a foreign state.

6.      This is an admiralty or maritime claim as provided in Rule 9(h) of the Federal Rules of Civil Procedure.

7.      This Court also has maritime jurisdiction over the subject matter of the action under 28 U.S.C. § 1333, in that Defendants' negligent and reckless acts affected vessels in navigation.  In addition, DNV's classification services are recognized as traditional maritime activities which necessarily occurred during and as an integral part of the operation and navigation of the Vessel while on navigable waters supporting admiralty jurisdiction.   DNV's negligent and reckless

conduct in not disclosing potential rudder cracking issues had the effect of compromising the safety and navigability of the Vessel for continued operation as a revenue generating bulk carrier ship which compounded the harm and loss to Owner when the Vessel was stranded.

8.     Venue in this Honorable Court is appropriate under 28 U.S.C. § 1391(b), (c) and/or (d).  Also, pursuant to Rule 82 of the Federal Rules of Civil Procedure, venue in an admiralty case is proper in any district in which the defendant can be personally served.

**THE PARTIES**

9.     Moti Shipping Ltd. was and is a citizen of a foreign state organized and existing under the laws of Hong Kong and maintains its principal place of business at 1801 Dina House, Ruttonjee Centre, 11 Duddell Street, Central, Hong Kong.

10.     Defendant Group was and is a corporation organized and existing under the laws of Norway and maintains a place of business in Norway.  Upon information and belief, before the merger between the Det Norske Veritas corporate family and the Germanischer Lloyd corporate family in 2013, Defendant Group formerly was known as Det Norske Veritas AS.

11.     Defendant DNV GL AS was and is a corporation organized and existing under the laws of Norway and maintains a place of business in Norway.

12.     Defendant DNV USA was and is a corporation organized and existing under the laws of the State of Texas and is registered to do business in the State of New York.

13.     The Doe Defendants are other companies in the Group that participated in the development, approval of design, evaluation, and/or other aspects of creation and maintenance of the rudder system on board the Vessel.

14.     Defendant Group and Defendant DNV GL AS promote themselves as a worldwide brand with respect to ship design and ship inspection services.

15.     With respect to the United States, Defendant Group and Defendant DNV GL AS routinely provide services to customers in ports nationwide.   Upon information and belief, Defendant Group and Defendant DNV GL AS provide services to some customer in the United States every day.   In the case of many of such provisions of service, the actual service is provided by Defendant Group's and Defendant DNV GL AS' U.S. affiliates, Defendant DNV USA and/or one or more of the Doe Defendants.

16.     Review of on-line information currently available shows that Defendant DNV GL AS is listed as having an office in Katy, Texas.   That office is listed as being at the same address as the headquarters of Defendant DNV USA, 1400 Ravello Drive, Katy, TX 77449.   Defendant DNV GL AS is not, however, registered to do business in the State of Texas with the Texas Department of State.

17.     Defendant Group and Defendant DNV GL AS intentionally take advantage of their branding by maintaining a website, issuing marketing materials, reports and invoices with the generic "Det Norske Veritas" letterhead or "DNV-GL" branding without providing a corporate designation for the actual entity issuing the materials or performing the work.   For example, in the current case, when the Vessel arrived in Connecticut weeks after the rudder system casualty, the Vessel was attended not by representatives of Defendant Group and/or Defendant DNV GL AS. Rather, the Vessel was attended by a representative from DNV's "New York Station" as indicated on the DNV Preliminary Survey Report.   Yet that document contained information in the footer reciting the corporate name of Det Norske Veritas AS and its corporate address in Norway.

18.     Defendant Group and Defendant DNV GL AS use common offices in the United States with Defendant DNV USA (specifically the offices at 1400 Ravello Drive, Katy, TX).

19.     Upon information and belief, Defendant Group and Defendant DNV GL AS use common telephone numbers in the United States with Defendant DNV USA.

20.     Upon information and belief, Defendant DNV USA employees perform assignments and tasking by Defendant Group and Defendant DNV GL AS with accounting for such services at arm's length.

21.     Upon information and belief, Defendant DNV USA is an alter ego of Defendant Group and/or Defendant DNV GL AS, in that Defendant DNV USA is controlled and dominated by Defendant Group and/or Defendant DNV GL AS such that Defendant DNV USA has no corporate mind of its own but instead primarily carries out the business of Defendant Group and/or Defendant DNV GL AS rather than its own.

## FACTUAL ALLEGATIONS

**A.     Vessel Construction,  Design, and Defendant DNV's Unique Role in the Process.**

22.     The Vessel is a bulk carrier of 43,842 gross registered tons, built by non-party STX Offshore & Shipbuilding Co. Ltd. (the "Builder") in South Korea in 2010.

23.     The Vessel was built pursuant to a shipbuilding contract between the Builder and a company within the Aegean, formerly Arcadia Group,  a group based in Greece and not related Plaintiff Owner ("Arcadia").   Arcadia subsequently entered into negotiations with the Builder which resulted in the Builder agreeing to release Arcadia from its purchase obligations in respect of this newbuilding and a second similar newbuild.   In August 2009, Plaintiff Owner was

approached by the Builder with an offer to take over the two building contracts, which Plaintiff Owner agreed.  Accordingly on September 30, 2009 the Builder and Plaintiff Owner entered into a shipbuilding contract (the "Shipbuilding Contract") in respect of the Vessel pursuant to which Builder agreed to design, build, launch, equip and complete the Vessel in 2010.  The Shipbuilding Contract was signed by Sur Navigation Ltd, which was the previous name of the Plaintiff Owner.

24.     The Vessel was one of a number of Kamsarmax-sized ships (having to do with the specific maximum length of a ship), built to the same design.

25.     Upon information and belief, by Article l(b) of the Shipbuilding Contract, Defendant Group or Defendant DNV GL AS was identified as the classification society for the shipbuild.

26.     Before the Vessel was delivered in 2010, there was no contractual relationship between Defendants and Owner.  All of the Defendants which provided services to the Builder were retained by the Builder.

27.     The Vessel was marketed to the maritime industry as having pre-approval and certification by the Group and/or DNV GL AS as class surveyors.

28.     The influence of one or more of the Defendants in the approval of the design and build process is pervasive and determinative.  Owner, for example, did not have the right to reject drawings (pursuant to Article 4(c) of the Shipbuilding Contract), which were already deemed approved. However, by Clause l(b)(iii) and 1(b)(iv), of the Shipbuilding Contract "all major plans . . . used in the construction of the Vessel" were subject to "inspection and test" by Group and/or

DNV GL AS, and their decision "as to whether the Vessel complies with the regulations of the Classification Society [was] final and binding upon the Builder and the Buyer."

29.     Classification societies, including Defendants, describe their purpose as safeguarding life, property and the environment.  Defendants benefit monetarily from providing classification and technical assurance along with software and independent expert advisory services to the maritime, oil & gas and energy industries.  They also provide certification services to customers across a wide range of industries.

30.     In all respects, a classification society is supposed to be an essential link in the overall safety chain of the marine industry.

31.     The primary purpose of Defendants at the ship build and design phase is to determine the structural and mechanical fitness of ships and other marine structures for their intended purpose through the classification process.

32.     In the case of the Vessel post-delivery, one or more of the Defendants also were in charge of issuing class certificates regarding the Vessel's material status.  Those activities by Defendants, however, are not the basis of this suit.

33.     Based on its extensive research and experience in the maritime industry over the years, classification work by Defendants in the design and build phase of a vessel is a representation by Defendants to the Plaintiff Owner and to the world as to the soundness, seaworthiness and fitness of the Vessel, as designed and presently constituted.

34.     Particularly with the dangerous maritime incident with the Vessel, the vessel design originally approved by Defendant featured a cast rudder horn.  However, that was changed to a fabricated rudder horn in around July 2007.  The reason was apparently to save the shipyard time and expense.  The change would prove dangerous and costly to Owner.

**B.     The Vessel Casualty**

35.     In late 2010, Owner took delivery of the Vessel.  Just over three years later, on January 8, 2014, the Vessel was at sea with a full cargo of coal destined for Bridgeport, Connecticut.

36.     Without warning of danger and on a relatively calm weather day, the crew heard a loud noise from the stern of the Vessel and immediately lost control of the Vessel's steering.  Upon inspection, it became apparent that the Vessel could not propel itself safely and that a salvage tug would be necessary.

37.     To be stranded at sea with a disabled, fully-laden ship is a dangerous situation for even the most skilled master and crew.  The violent sound and immediate helplessness in steering the Vessel had a traumatic effect on the Vessel's crew, particularly in view of the impending onset of adverse Atlantic weather.

38.     The salvage tug contracted to assist the stricken Vessel towed her to the original discharge port of Bridgeport, Connecticut.  This was so that she could discharge her cargo rather than seek an intermediate port of refuge to carry out repairs because, in her loaded condition, she could not drydock for repairs.

39.     During the towage, the weather conditions in the Atlantic Ocean worsened and damage was sustained by the tug's towing gear.   The perilous journey northward to the United States for discharge exacerbated the crew's mental agony and potential for further distress at sea.

40.     The Vessel berthing in Connecticut was delayed due to heavy snowfall at that point of time.   In Connecticut, the cargo was transshipped to another vessel while carefully observed by the United States Coast Guard.

**C.     The Classification Society Investigation and other Surveyors Post-Incident in Connecticut**

41.     Various Owner and insurance interests immediately conducted surveys of the Vessel to determine the extent of damage.   Representatives of one or more of the Defendants were present for these initial investigations.

42.     Surveys showed that the rudder, rudder horn and rudder stock were missing from the Vessel.  The rudder stock had failed just below the upper rudder gudgeon bearing of the rudder stock and the rudder horn had failed just below the connection to the sloping hull plating.

43.     Experts retained by the Owner concluded that original design and assembly of the rudder system was negligent and caused the incident.

44.     In particular, while the rudder horn was constructed mostly of high strength steel, one or more of the Defendants failed to take into account the effect of welding on the rudder horn's fatigue life, and no suitable material factor was included to accommodate the likely fatigue. As a result, the stress load was above the material's fatigue threshold.

45.     Without this allowance, the geometry of the rudder assembly was inappropriate for the loading requirements as the Vessel's rudder was employed.  Because of this failure by one or more of the Defendants to take these factors into account, the rudder system was overloaded and cracks developed (and propagated) in the rudder horn and rudder stock.  Progressive fractures connecting two stress concentrations on either side of the horn undermined the whole structure and resulted in complete loss of the rudder horn.

46.     Investigations showed that the areas where the cracks were found: (1) at the transition from the rudder horn to the Vessel's hull, and (2) at the gudgeon casting, were the areas of highest bending stresses during the Vessel's operation.

47.     As the approver design of the Vessel's designs and plans, one or more of the Defendants knew or should have known that the locations at which the rudder system broke were locations that were expected to experience the highest cyclic loading during service, and should have ensured that allowances were made for that stress in the rudder system's construction.

48.     The highest permissible stress for the higher tensile steel material used in a rudder is 167MPa.  Finite Element Analysis ("FEA") conducted by Owner's experts showed that the stress levels at the crack locations significantly exceeded the permissible stress levels at 200-230 MPa and 250-300 MPa respectively.

49.     It was clear from the results of the FEA that bending of the rudder horn would cause buckling of the shell plating of the horn at the crack locations. Stresses were amplified by the fact that the hull plating was not as stiff as the surrounding parts. All of these points should have been apparent to DNV in the years that it was the classification society of record for the approval of the design and build of the Vessel.

50.     Following the incident, Defendants Group and/or DNV GL AS immediately were aware of the rudder crack issue consequences.

51.     On January 15, 2014, a week after the incident, Defendants' Hong Kong office sent Owner a report from the Norwegian head office attaching drawings of previous cases of similar cracks and the work done to repair the cracks before the rudder was lost. The report states that the first cracks were found more than **eight years previously**.

52.     Defendants knew about the risk of cracks developing in their rudder system design since at least 2006, well before the delivery of the Vessel to Owner.  Despite Defendants' obligations to any potential shipowner pre-delivery, and then specifically to Owner mid-delivery once the contract with Builder was completed in 2009, Defendants negligently and recklessly did nothing to advise Owner of the substantial risk to the Vessel's rudder system caused by Defendants' defective design.

53.     Further investigation disclosed similar cracks that were found in the rudder systems of the Vessel's sister ships (built in a similar manner at the same time period), owned by companies related to Owner.  On January 22, 2014, Defendants' Hong Kong office had a further exchange with Owner about the work required to repair the cracks on the sister ships.  A document was sent entitled "STX *Jinhae built bulk carrier. Typical repair for cracks in rudder horn*".

54.     Defendants' Hong Kong office followed-up on January 29, 2014 to Owner with the results of a FEA on a similar vessel that showed exactly where the hotspot stress concentrations were found.  The results show that the problems encountered on the Vessel were more than an isolated incident of cracking.  Rather, Defendants had conducted a detailed investigation into a

12

known problem, the results of which Defendants failed to report to Owner, leaving Owner to operate the Vessel with a rudder system that was tantamount to a ticking time bomb.

55.     Despite all the knowledge that one or more of the Defendants possessed well before the Vessel's rudder loss, Defendants only sent an alert on rudder system cracks to all industry shipowners on or about January 30, 2014, about three weeks after the Vessel casualty.  For reasons unknown, despite the alert being sent as a general broadcast to its customers, Defendants' Hong Kong office refused to provide Owner with a copy of that alert.

56.     Following the issuance of Defendants' alert, further inspections were carried out and stress fractures of varying degrees of severity were found on several Kamsarmaxes built to Defendants' approved design.  Owner has addressed these issues with other vessel owners; while all those ships have required repair, to Owner's knowledge only the Vessel lost the rudder.  Upon information and belief, further vessels, including sister vessels owned by Owner's group companies will (and do) have similar cracking in their rudder systems built to the design approved by Defendants.

57.     Defendants never have adequately explained to Owner why, despite their apparent knowledge of the design failures from 2006 onwards, they negligently and/or recklessly failed to inform Owner about these issues during the Vessel's construction phase or thereafter.

58.     Owner would not have agreed to the significant financial outlay involved in purchasing the Vessel unless it had been given a level of comfort that the approval of the design process had been carried out properly.  That comfort came in the explanation that the plans for the ship had been reviewed and approved by Defendants in advance of Owner's executing the shipbuilding contract.  Defendants' knowledge of rudder cracking back in 2006, and Defendants'

failure to disclose such knowledge to Owner despite being directly relevant to Owner's Vessel and despite the fact that the deficiency posed severe hazards to safe vessel navigation, constitutes negligent and/or reckless conduct.

59.     Defendants had several opportunities after 2006 to alert Owner to the risk of rudder failure, including the following inspections before the Vessel was delivered to Owner:

a.      On March 29, 2007, Defendant Group and/or Defendant DNV GL AS approved the rudder bearing bushing material manufactured by Hankuk Fiber Glass Co. Ltd.;

b.      On December 14, 2009, Defendant Group and/or Defendant DNV GL AS approved the steel fabricated rudder horn manufactured by Hae Duk Rudder & R Stock Co. Ltd. ("Hae Duk");

c.      On January 22, 2010, Defendant Group and/or Defendant DNV GL AS approved the rudder pintle with sleeve manufactured by Hae Duk;

d.      On January 22, 2010, Defendant Group and/or Defendant DNV GL AS approved the rudder assembly manufactured by Hae Duk;

e.      On March 2, 2010, Defendant Group and/or Defendant DNV GL AS issued inspection report S2053 on the horn bearing machining; and

f.      On March 9, 2010, Defendant Group and/or Defendant DNV GL AS approved the rudder stock and sleeve manufactured by Hae Duk.

**D.     Damages Suffered from DNV's Failures**

60.     Plaintiff's damages following the incident were substantial.

61.     Joint surveys when the Vessel was in drydock on April 9, 2014 confirmed that the rudder horn had fractured at the vertical horn plate near to the fillet weld to the horizontal hull plate and had propagated along the entire circumference of the horn.  The rudder stock had parted just below the lower bearing sleeve.

62.     In addition to the rudder horn, the steering gear actuator was also found damaged, the lower surface of two rotor vanes were scored and the steering gear casing was scored on the internal wall and bottom plate.  Damage was also confirmed to the starboard side hull plating at frames Nos. 13 and 14 in way of the engine room and at frame No. 10 in way of the aft peak.

63.     Permanent repairs required fabrication and fitting of a new rudder horn, blade, stock and pintle and repairs to the hull damage.  Additional damages include: loss of use of the Vessel during the repair period, the Owner's proportion of general average, Vessel costs not covered by general average, insurance deductibles, various fees and costs, and distress caused to the Owner's crew and support team.  Total damages to Owner are no less than $8,000,000.

64.     All conditions precedent to the filing of this action have been performed, waived, or excused.

65.     Plaintiff reserves the right to add claims and/or parties to these proceedings as additional discovered facts may warrant their addition.

## COUNT I

### (Maritime Tort of Recklessness)

66.     Plaintiff Moti restates and re-alleges the foregoing paragraphs of this Complaint as if fully set forth herein.

67.     Defendants knew of the risk of harm to Owner as a prospective purchaser of the Vessel before executing the Shipbuilding Contract by their reckless, willful and wanton acts in allowing the Vessel to be designed and constructed with a faulty rudder horn such that the Vessel was unfit for service as a bulk carrier requiring Owner to have significant loss of use of the Vessel and be subject to substantial repair damages and loss over and above the purchase price paid for the Vessel.

68.     Defendants knew or should have known the faulty design and construction of the fabricated rudder horn exposed Owner to extraordinary risks of property damage, loss, and risk to the safety of master and crew on the Vessel, which condition and risks would be obvious to anyone with their special knowledge and expertise.

69.     Defendants knew that the precautions that would eliminate or reduce the risk concerning the dangerous rudder condition of the Vessel involved burdens that were so slight relative to the magnitude of the risk as to render Defendants' failure to consider carefully information of rudder cracking on other vessels years before the design and construction of the Owner's Vessel (and the incident itself) a demonstration of the Defendants' indifference to the risk that Plaintiff would suffer severe losses and actual damages as were incurred by Owner when the Vessel suffered its casualty in the middle of the Atlantic Ocean and required immediate salvage assistance.

70.     Defendants had superior technical knowledge regarding the design and construction of maritime vessels and at all material times were aware of the true condition of the Vessel.

71.     Defendants knew the extraordinary high risk of severe economic damages and losses to Owner created by their reckless, willful, and wanton acts in not using their in-house knowledge of rudder cracking events dating to 2006 to ensure that the design and construction of the rudder horn on the Vessel would be suitable for its intended sea-going purpose, and to the financial cost to Owner that would be suffered when the Vessel inevitably broke down.

72.     The precautions the Defendants would have to take, including but not limited to proper classification of the Vessel even if incorporating the cast rudder horn, as opposed to the fabricated rudder horn which saved the shipyard time and expense, was slight relative to the risk posed to Owner of extraordinary damages and economic losses due to unsafe conditions of the Vessel and requirement of major repairs and cancellation of further work voyages plying its trade. Moreover, the burden on Defendants to report to Owner the potential rudder cracking issue was inconsequential in comparison to the risk of harm (both physical and financial), which was significant.  Upon information and belief, Defendants placed their relationship with the shipyard and its consequential financial benefits at a higher premium than disclosing to the industry the existence of the fault in its rudder system, of which choice Owner paid the consequences.

73.     Defendants' knowledge of rudder cracking going back to 2006, as acknowledged post-incident to Owner, was second to none.  Defendants, the designer and class surveyor during the design and build of the ship, possess a specialized and proprietary expertise on the proper construction of bulk carriers and knowledge of other incidents in the industry.  DNV therefore knew or had reason to know that its acts and omissions showed a conscious disregard and reckless

abandonment of the very tasks which Defendants were supposed to objectively and expertly perform, resulting in a fundamental breakdown of the Vessel mid-Atlantic, and establishes conscious misconduct and severe recklessness by DNV which created a high degree of harm to Owner.

74.    Defendants' conduct amounted to recklessness as it demonstrated an extreme departure from the standards of ordinary care such that the damages suffered by Owner were either known to Defendants or so obvious that Defendants must have been aware of the potential for damages.

75.    But for Defendants' reckless, willful, and wanton acts, the Vessel would not have been rendered useless for commercial purposes until substantial repairs were completed.

76.    The reckless, willful, and wanton acts carried out by Defendants caused Plaintiff substantial damages and Owner has incurred obligations for damages in the approximate amount no less than $8,000,000.00, together with interest, costs, and attorneys' fees.

77.    The reckless, willful, and wanton acts and omissions carried out by Defendants were reprehensible and caused economic harm to Owner and showed a complete indifference to, or a reckless disregard for, the health and safety of others in permitting a Vessel to be operated with a faulty designed and constructed rudder warrant the imposition of exemplary or punitive damages as may be imposed by this Honorable Court.

**WHEREFORE**, Plaintiff Moti requests the Court to enter judgment in its favor and against Defendants jointly and severally, for compensatory damages in the amount of no less than $8,000,000.00, and for exemplary and punitive damages, together with prejudgment and post judgment interest, costs, attorneys' fees, and any other relief deemed appropriate by the Court.

## COUNT II

### (Negligence and Negligent Misrepresentation)

78.     Plaintiff Moti restates and re-alleges the foregoing paragraphs of this Complaint as if fully set forth herein.

79.     Defendants were aware that the Vessel was marketed with pre-approval and certification by the Group as class surveyors.

80.     Defendants knew or should have known based on the company's knowledge of rudder cracks dating back to 2006 that rudder failure was a serious concern and left the Vessel in an unsafe condition which was not sufficient to allow the safe carriage of crew and cargo.

81.     Despite actual knowledge of the condition of other similar Vessels and the design and construction of this Vessel, Defendants approved the build at the shipyard in all respects in regard to the rudder horn.

82.     Defendants owed a duty to Plaintiff to perform its services with reasonable care and diligence in administrating the issuance of proper rudder designs and construction oversight as class surveyor for the build, and a duty to withdraw approval of the work promptly when it knew or should have known that the Vessel was in a condition which did not meet safe standards. Defendants breached their duty by, *inter alia*, failing to use a cast rudder horn, as opposed to the fabricated rudder horn which saved the shipyard time and expense, as part of the Vessel's rudder system.

83.     Plaintiff justifiably relied upon Defendants' representations concerning the suitability of the Vessel to operate as a bulk carrier when in reality the rudder horn was a ticking timebomb.

84.     Defendants knew or should have known that its negligent, reckless, willful and wanton provision of design and survey oversight imperiled the property, health, environment and well-being of the Plaintiff and others.

85.     As a result of the foregoing negligence and negligent misrepresentations, the Vessel was presented to Owner as suitable to complete voyages carrying cargo and crew when in fact it was in an and unsafe condition ultimately requiring major repairs.

86.     Plaintiff incurred substantial actual damages in correcting and repairing the deficiencies to the Vessel in the approximate amount of no less than $8,000,000.00, together with interest, costs, and attorneys' fees.

**WHEREFORE**, Plaintiff Moti requests the Court to enter judgment in its favor and against Defendants jointly and severally, for compensatory damages in the amount of no less than $8,000,000.00, and for damages, together with interest, costs, and attorneys' fees, constituting the amount owed to Plaintiffs by Defendants because of the negligent misrepresentations.

Dated: January 7, 2016
New York, NY

HOLLAND & KNIGHT, LLP

Michael J. Frevola
michael.frevola@hklaw.com
Christopher R. Nolan
chris.nolan@hklaw.com
K. Blythe Daly
blythe.daly@hklaw.com
Holland & Knight LLP
31 West 52nd Street
New York, New York 10019
Telephone: (212) 513-3200
Facsimile: (212) 385-9010

*Attorneys for Plaintiff*